

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 24, 2023

**BY ECF**
The Honorable John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: *United States v. Michael Poli*, S1 22 Cr. 212 (JGK)

Dear Judge Koeltl:

    The Government respectfully submits this letter in advance of defendant Michael Poli's sentencing, scheduled for August 2, 2023. For the reasons detailed below, the Government respectfully submits that a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing. The Government further seeks imposition of a three-year term of supervised release.

**I.    Factual and Procedural Background**

    Michael Poli has been committing crimes in connection with the Genovese Family of La Cosa Nostra ("LCN") since at least 2011.

    From approximately 2011 through 2014, Michael Poli operated an illegal gambling business with Ralph Balsamo. (PSR ¶ 63). Poli and Balsamo, among others, were arrested in 2016 and charged with racketeering offenses. *See* 16 Cr. 522 (RJS). Poli ultimately pled guilty to operating an illegal gambling business and was sentenced to six months' home confinement followed by three years' supervised release. (PSR ¶ 63).

    While on federal supervised release for this 2016 federal case—the terms of which included conditions of no contact with illegal gambling operations and a search condition—Poli continued his participation in Genovese Family racketeering activity, including operating an illegal gambling business with Balsamo and engaging in extortion. (PSR ¶ 20). Poli regularly collected debts using explicit threats of violence and, on at least one occasion, by displaying a firearm. (PSR ¶¶ 22-24). Poli's superiors—Balsamo and Nicolas Calisi—believed him capable of violence, as is clear from their intervention to prevent him from committing an assault that they feared would bring unwanted law enforcement attention on the Family. (PSR ¶ 25).

    During this time, Poli actively sought formal induction into the Genovese Family—an endeavor that was supported by his superiors, Balsamo and Calisi. (PSR ¶ 26). One impediment

to Poli being made was the lenient disposition he had received in his prior state criminal cases, raising questions about his possible cooperation with law enforcement (which would have precluded his induction into the mafia, among other consequences). (*Id.*). To assuage these concerns, Poli was required to gather documentation regarding those cases and their resolutions, which he took considerable pains to do. (*Id.*). Poli's deep desire to be inducted into the Genovese Family is clear both from the efforts he undertook to prove his non-cooperation with law enforcement and from intercepted communications between Poli and Balsamo. For example, during the time that Poli's proposal was being discussed, an individual who owed Poli money was inducted into another LCN Family. (Line 1954, Ref # 4914). Consistent with LCN rules, Balsamo instructed Poli not to have contact with that individual because Poli was not yet a Soldier. (*Id.*). After this phone call, Poli texted Balsamo: "I know it takes time so don't take it wrong but it is *heartbreaking* to see these joke[r]s moving up, but I need to learn more." (Line 1954, Ref. # 5000 (emphasis added)).

While on federal supervised release, Poli also took steps to conceal from his probation officer and from the court his ongoing, extensive participation in organized crime. For example, while Balsamo and Poli were both on supervised release from the 2016 case detailed above, Balsamo instructed Poli to lie to Judge Sullivan regarding Poli's continued association with LCN members, including Balsamo, which is exactly what Poli did. (PSR ¶ 27). Poli's lie allowed him to receive early termination of supervised release.

During this time, Poli also took various actions aimed at avoiding law enforcement detection, including regularly changing his phone number and identifying a pole camera outside of his tanning salon, which he promptly reported to Balsamo. (Line 3409, Ref. # 9352). In addition, following law enforcement's search of co-defendant Michael Messina's home, Poli acted as a go-between for Messina and Balsamo. (PSR ¶¶ 28-29).

On February 8, 2023, Poli pled guilty, pursuant to a plea agreement, to conspiring to conduct the affairs of the Genovese Family of La Cosa Nostra through a pattern of racketeering activity from approximately 2011 through his arrest in April 2022. Pursuant to the parties' plea agreement, the parties stipulated to a Guidelines range of 41 to 51 months' imprisonment (rather than the otherwise applicable range of 46 to 57 months' imprisonment) in light of the global resolution of this matter. (PSR ¶¶ 5(o), 114). The parties' Guidelines calculation is consistent with that employed by Probation in the presentence report. (PSR ¶ 99). Probation recommends a sentence of 41 months' imprisonment. (PSR at 30). Poli requests an unspecified below-Guidelines sentence based on: (i) his acceptance of responsibility, (ii) claims of "extraordinary charity," (iii) his familial obligations, (iv) his pretrial release to home detention, and (v) the sentences imposed on his co-defendants. (Dkt. No. 159 at 12).

## II. Discussion

### A. Applicable Law

As the Court is well aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions,"

district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007). After that calculation, however, the Court must consider not only the Guidelines, but also the six other factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing (as set forth below); (3) "the kinds of sentences available"; (4) any relevant policy statement by the Sentencing Commission; (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence Within the Stipulated Guidelines Range and Three Years Supervised Release is Appropriate

For the reasons detailed below, the Government respectfully submits that a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment followed by three years' supervised release would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Such a sentence is necessary to reflect the seriousness of, and to provide just punishment for, the offense. Racketeering conspiracy, particularly as it relates to membership in an LCN Family, is a deeply serious offense. Membership in the Genovese Family is necessarily approved by the leadership of all five LCN Families based on a collective view of an individual's ability to support organized crime, whether through generating profits or carrying out violence. In return for the profits and protection of Genovese Family membership, members swear a lifetime oath to a criminal organization. Poli was deeply committed to becoming a member of the Genovese Family, so much so that he found it "heartbreaking" that someone else would be inducted while he remained under consideration. That Poli believed his highest calling was lifetime membership in a criminal organization speaks volumes.

Moreover, the racketeering activities in which Poli personally participated—operating an illegal gambling business and extortion—are key revenue generators for organized crime that are profitable only because they victimize people. The gambling addicts victimized by the no-money-down gambling operations become prime targets for LCN's extortion operations, as thoroughly evidenced by the wiretaps in this case. And both types of illegal operations are only successful

because of LCN Families' reputations for violence, which allow them to extract payment where a legally operated bank or casino, for example, could not. Indeed, as recounted in the PSR, Poli regularly threatened debtors with violence (e.g., "Do I need to fucking punch you in your fucking face to get my point across?" "I'll put a fucking bullet so far into your fucking head." (PSR ¶ 24)), and on at least one occasion threatened a debtor with an actual gun (PSR ¶ 22).

Poli's history and characteristics further demonstrate that a sentence within the stipulated Guidelines range is necessary to promote respect for the law, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. This case is not Poli's first interaction with the criminal justice system. He has two prior state convictions, one for criminal possession of a firearm and one for criminal possession of narcotics, as well as a 2016 illegal gambling conviction from this District, described above. (PSR ¶¶ 61-63). In each instance, Poli was shown extraordinary leniency, which he repaid by committing more crimes. That Poli has little respect for the law is plain, as is the fact that felony charges—whether state or federal—have not deterred him from continued, serious criminal conduct. Nonetheless, when convenient, Poli has falsely claimed that these brushes with the law have taught him respect and deterrence. At Poli's 2017 sentencing before Judge Sullivan, Poli described his gambling partnership with Balsamo as "a small opportunity that was given to me and I decided to take it and it turned out not to be a smart choice." (16 Cr. 522 (RJS), 9/18/17 Tr. 39-40). Poli told Judge Sullivan: "I just want to apologize to my family and friends. I made this mistake. I was kind of blindsided by the money. I needed a couple of dollars at the time. I made a terrible mistake and I realize that the risk of losing my daughter and my wife is not worth it, and I apologize." (16 Cr. 522 (RJS), 9/18/17 Tr. 39). When Judge Sullivan asked Poli what he now planned to do with his life, Poli replied: "Go to work, go home to my wife, and daughter. That's really it." (16 Cr. 522 (RJS), 9/18/17 Tr. 43). Of course, what Poli actually did was set up new gambling and extortion operations, protected and supported by the Genovese Family, in an effort to obtain lifetime membership in a criminal organization. Poli's belated, disingenuous claims of contrition (Dkt. No. 159) should be seen for what they are.

Poli fails to identify a single factor justifying a sentence below the stipulated Guidelines range. Poli's willingness to resolve this case through a guilty plea is already reflected in a three-level reduction in his offense level for acceptance of responsibility (PSR ¶¶ 57-58)—there is no reason for the Court to vary based on a factor already accounted for in the Guidelines calculation. Poli's so-called "extraordinary charity" should viewed in context, specifically the countless people that Poli has harassed, threatened, and generally victimized. Likewise, the Court should be aware that Poli relied on such "charity" in seeking leniency from Judge Sullivan. (16 Cr. 522 (RJS), Dkt. No. 1021-6). Turning to Poli's familial obligations, it is a sad truth that defendants' families bear some of the emotional and financial consequences of their loved ones' incarceration. That is as true of Poli's family as it is of the families of many other defendants that appear before the Court for sentencing, whether drug dealers, gang members, or fraudsters. Poli made a choice to enter into mafia life and to dedicate himself to that criminal endeavor, and he did so knowing the potential cost to his family. Indeed, he specially told Judge Sullivan that the cost to his family was enough to put him back on the right side of the law. Instead, Poli doubled down on his criminal commitments. He should not now be rewarded for that choice. Finally, the Government acknowledges that this Court has imposed sentences below the co-defendants' respective Guidelines ranges. The Government nonetheless believes that, for the reasons detailed herein, a sentence within the stipulated Guidelines range is appropriate for Poli, particularly given his

involvement in threats and acts of violence and his criminal history.

### III. Conclusion

For the forgoing reasons, the Government respectfully submits that a sentence a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment followed by three years' supervised release would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Celia V. Cohen
Assistant United States Attorney
(914) 993-1921

Cc: Anthony DiPietro, Esq. (by ECF)